

**In the**
**Missouri Court of Appeals**
**Western District**

TIFFANIE SOETAERT,

      Appellant-Respondent,

v.

NOVANI FLIPS, LLC,

      Respondent,

PLATINUM REALTY OF MISSOURI,
LLC,

      Respondent-Appellant.

**WD82933 Consolidated with**
**WD82964**

**OPINION FILED:**

**AUGUST 3, 2021**

---

**Appeal from the Circuit Court of Jackson County, Missouri**
**The Honorable Kevin D. Harrell, Judge**

**Before Division One: Alok Ahuja, Presiding Judge, Lisa White Hardwick, Judge, and**
**Anthony Rex Gabbert, Judge**

Tiffanie Soetaert and Platinum Realty of Missouri, LLC ("Platinum") appeal and cross-appeal the judgment of the Jackson County Circuit Court awarding Soetaert compensatory damages, punitive damages, and attorneys' fees in Soetaert's suit for violation of the Missouri Merchandising Practices Act ("MMPA) against Platinum, Novani Flips, LLC ("Novani"), and MoreKC1, LLC ("MoreKC1"). In three points on appeal, Platinum claims the trial court erred in finding it was liable under the MMPA, in instructing the jury, and in awarding punitive damages. In one point on appeal, Soetaert claims the trial court erred in determining the amount of attorneys' fees awarded. The judgment is affirmed in part and reversed and remanded in part.

**Facts**

Nancy Mechlin is a licensed realtor with Platinum. She previously owned Missouri Real Estate Exchange with Dan Reedy when they were married. It was a business that bought and sold real estate. Missouri Real Estate Exchange later became MoreKC1 after Mechlin and Reedy divorced, and she was no longer directly involved in that business.

While working with Reedy, Mechlin represented Matthew and Christa Phillipchuck ("the Phillipchucks") several times. They did not live in the United States. The Phillipchucks were considered joint clients of Mechlin and MoreKC1 since MoreKC1 sold properties to them as rentals and flips[1] while Mechlin provided listings and managed rentals for them. Mechlin worked with the Phillipchucks for several years before she listed the house at issue in this case. The Phillipchucks were the owners of the LLC known as Novani in this case.

Even after their divorce, Reedy would send Mechlin potential investment opportunities and ask her opinion about those investments. While Mechlin didn't recall what information she received as part of the transaction at issue in this case, she stated she would typically receive an address, scope of work needed, and a document called "Best and Worst Case Analysis" from Reedy. Sometimes she would receive pictures too. Mechlin would review the information Reedy sent over and provide a generalized "best case" and "worst case" sales price based off of comparable home sales in the neighborhood.

Reedy visited the house at issue in this case prior to its purchase. He observed cracks in the foundation in the partially unfinished basement. He also observed evidence of water intrusion in the basement. Reedy sent an email to Mechlin regarding the house, describing the property as

---

[1] Flip refers to purchasing real estate, improving it, and then selling it in a relatively short period of time.

one that "NEEDS FULL REHAB" and inquired of Mechlin: "What's your best case scenario retail price . . . Can it get to $150k?" Mechlin responded something to the effect of "the numbers work." He informed the Phillipchucks of the house's issues and presented it as an investment opportunity. They purchased the house, and Reedy was in charge of making the necessary repairs and upgrades before selling it. Reedy subcontracted out the work done on the house. Part of this work included epoxy injections in the foundation, placing I-beams on the interior foundation wall, and creating a yard swale. The basement was also finished with drywall.

Once work was completed, the house was listed for sale with Mechlin serving as the seller's agent for the Phillipchucks. The listing stated that the house was "completely renovated: and "ready for a family to call it home." Soetaert ultimately purchased the house in 2015.

During the purchase process, Soetaert received a sellers disclosure form. Mechlin filled out the form for the Phillipchucks. Mechlin put a slash mark through twelve sections of the form. She wrote that the sellers lived out of the country, had never visited the property, and had limited knowledge. Mechlin slashed through the section asking about water intrusion and repairs that had been made to the foundation. She attached a scope of work document to the disclosure. That document referenced four piers being put in the foundation but did not address water intrusion or the epoxy injections.

After purchasing the home, Soetaert began experiencing water intrusion in the finished basement. She ultimately had the problem fixed at a cost of $13,950, which included pushing the wall back 24 inches, installing five interior braces, and installing a sump pump and back up pump. The cost of repairs did not include the expense involved with restoring the basement paneling, sheetrock, and carpet.

3

Soetaert filed a petition against Novani, MoreKC1, and Platinum alleging Count I – Violation of the Missouri Merchandising Practices Act, Count II – Fraudulent Misrepresentation, and Count III – Civil Conspiracy. A jury trial was held beginning December 10, 2018. Soetaert abandoned her Fraudulent Misrepresentation and Civil Conspiracy claims and submitted to the jury only on the Violation of the Missouri Merchandising Practices Act claim.

The jury returned a verdict in the amount of $25,000 in compensatory damages against each defendant, $75,000 in punitive damages against Novani, $75,000 in punitive damages against MoreKC1, and $25,000 in punitive damages against Platinum. The trial court granted Platinum's motion for amended judgment and merged the compensatory damages into a single award for $25,000. The trial court then entered a second amended judgment awarding Soetaert $11,623.47 in attorneys' fees and costs.

Platinum's appeal and Soetaert's cross-appeal follow.

**Platinum's Point I**

In its first point on appeal, Platinum claims the trial court erred in denying its motion for judgment notwithstanding the verdict as to liability on Soetaert's claim for violation of the MMPA. It states that section 339.730 precludes liability for a real estate licensee acting as a seller's agent for failing to disclose or failing to discover adverse material facts regarding a property unless the adverse material facts are actually known or should have been known by the licensee without an independent inspection. Platinum further maintains that section 339.190 precludes liability for a real estate licensee for any information in a seller's disclosure unless the licensee is a signatory or knew prior to closing that the statement was false or the licensee acted in reckless disregard as to whether the statement was true or false. It concludes that there was no evidence Platinum knew or should have known of the condition of the basement, Platinum did not sign the seller's

4

disclosure, and Platinum did not know or act in reckless disregard as to whether statements contained therein were true or false.

"The standard of review for failures to sustain motions for directed verdict and for JNOV is essentially the same." *Fleshner v. Pepose Vision Inst., P.C.*, 304 S.W.3d 81, 95 (Mo. banc 2010). "This Court must determine whether the plaintiff presented a submissible case by offering evidence to support every element necessary for liability." *Id*. "Evidence is viewed in the light most favorable to the jury's verdict, giving the plaintiff all reasonable inferences and disregarding all conflicting evidence and inferences." *Id*. "Neither a motion for directed verdict nor for JNOV should be granted unless there are no factual issues remaining for the jury to decide." *Id.*

The MMPA is found in Chapter 407. Section 407.020[2] states in relevant part:

> 1. The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce … is declared to be an unlawful practice.

Merchandise is defined as "any objects, wares, goods, commodities, intangibles, real estate or services." Section 407.010. Section 407.025 states in relevant part:

> 1. Any person who purchases or leases merchandise primarily for personal, family or household purposes and thereby suffers an ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful by section 407.020, may bring a private civil action in either the circuit court of the county in which the seller or lessor resides or in which the transaction complained of took place, to recover actual damages. The court may, in its discretion, award punitive damages and may award to the prevailing party attorney's fees, based on the amount of time reasonably expended, and may provide such equitable relief as it deems necessary or proper.[3]

---

[2] All statutory citations are to RSMO 2000 as supplemented through the time of the house purchase in 2015 unless otherwise stated.

[3] "Section 407.020 has at all times proscribed deceptive or fraudulent acts in connection with the sale of 'merchandise,' …. which the MPA expressly defines to include real estate." *Hess v. Chase Manhattan Bank, USA, N.A.*, 220 S.W.3d 758, 768 (Mo. banc 2007). "[B]oth the attorney general and private parties could sue a seller for

5

"The act's fundamental purpose is the protection of consumers … and, to promote that purpose, the act prohibits false, fraudulent or deceptive merchandising practices." *Huch v. Charter Commun., Inc.*, 290 S.W.3d 721, 724 (Mo. banc 2009) (internal quotation marks omitted). "The legislature intended section 407.020 to supplement the definitions of common law fraud in an attempt to preserve fundamental honesty, fair play and right dealings in public transactions." *Id*. (internal quotation marks omitted). "[Section] 407.020 does not define deceptive practices; it simply declares unfair or deceptive practices unlawful." *Id*. (internal quotation marks omitted). "This was done to give broad scope to the meaning of the statute and to prevent evasion because of overly meticulous definitions." *Id*. (internal quotation marks omitted). "This leaves to the court in each particular instance the determination whether fair dealing has been violated." *Id*. (internal quotation marks omitted). "It is the defendant's conduct, not his intent, which determines whether a violation has occurred." *Id*. (internal quotation marks omitted). "It is not necessary in order to establish 'unlawful practice' to prove the elements of common law fraud." *Id*. (internal quotation marks omitted).

"Although the legislature did not define deceptive practices, it granted the attorney general authority to promulgate all rules necessary to the administration and enforcement of the provisions of the act, which includes the authority to promulgate rules setting out the scope and meaning of the act." *Id*. at 724-25 (citing section 407.145) (internal quotation marks omitted). "[P]roperly

---

alleged use of deceptive practices in the sale of goods and services." *Id*. "Before 2000, though, only the attorney general could bring enforcement actions for deceptive practices in the sale of real estate." *Id*. "In 2000, the private right of action permitted under the MPA was broadened to include all transactions in 'merchandise.'" *Id*. "[F]or real estate transactions since that time, private citizens injured by MPA violations have a right to act as 'private attorneys general' for purposes of enforcing it." *Id*. at 768-69.

6

adopted and promulgated rules have independent power as law." *Id*. at 725 (internal quotation marks omitted). One of those rules states:

> (1) An unfair practice is any practice which--
>
> (A) Either--
>
> 1. Offends any public policy as it has been established by the Constitution, statutes or common law of this state, or by the Federal Trade Commission, or its interpretive decisions; or
>
> 2. Is unethical, oppressive or unscrupulous; and
>
> (B) Presents a risk of, or causes, substantial injury to consumers.
>
> (2) Proof of deception, fraud, or misrepresentation is not required to prove unfair practices as used in section 407.020.1., RSMo.

15 CSR 60-8.020. Section 339.730 states in relevant part:

> 3. A licensee acting as a seller's or landlord's agent owes no duty or obligation to a customer, except that a licensee shall disclose to any customer all adverse material facts actually known or that should have been known by the licensee. A seller's or landlord's agent owes no duty to conduct an independent inspection or discover any adverse material facts for the benefit of the customer and owes no duty to independently verify the accuracy or completeness of any statement made by the client or any independent inspector.

Section 339.840 provides that section 339.730 "shall not be construed to limit civil actions for negligence, fraud, misrepresentation or breach of contract." Section 339.190 states in relevant part:

> 2. A real estate licensee shall not be the subject of any action and no action shall be instituted against a real estate licensee for any information contained in a seller's disclosure for residential, commercial, industrial, farm, or vacant real estate furnished to a buyer, unless the real estate licensee is a signatory to such or the licensee knew prior to closing that the statement was false or the licensee acted in reckless disregard as to whether the statement was true or false.

7

3. A real estate licensee acting as a courier of documents referenced in this section shall not be considered to be making the statements contained in such documents.[4]

Reading these two statutes in conjunction with the MMPA and under the facts of this case, Platinum or its agent Mechlin is not liable for a violation of the MMPA unless it knew the statements in the disclosure were false or acted in reckless disregard as to whether the statement was true or false. *See, e.g., Anderson ex rel. Anderson v. Ken Kauffman & Sons Excavating, L.L.C.*, 248 S.W.3d 101, 107–08 (Mo. App. W.D. 2008) ("[W]here one statute deals with a particular subject in a general way, and a second statute treats a part of the same subject in a more detailed way, the more general should give way to the more specific.") (internal quotation marks omitted). "Reckless disregard exists when there is a high degree of awareness of ... probable falseness of the statement or there are serious doubts as to [its] truth." *Wandersee v. BP Products N.A., Inc.*, 263 S.W.3d 623, 632 (Mo. banc 2008) (internal quotation marks omitted).

Pursuant to the Exclusive Right to Sell Contract, Mechlin, on behalf of Platinum, agreed that it was her responsibility to: "disclose to all prospective buyers all adverse material facts actually known by the broker, including, but not limited to . . . the physical condition of the property…and any material defects in the property." Platinum claims on appeal that Mechlin was not aware of and did not recklessly disregard material defects in the house.

---

[4] Section 339.190 was revised, effective August 28, 2019, to add another section:

4. A real estate licensee shall not be the subject of any action and no action shall be instituted against a real estate licensee for the accuracy of any information about the size or area, in square footage or otherwise, of a property or of improvements on the property if the real estate licensee obtains the information from a third party and the licensee discloses the source of the information prior to an offer to purchase being transmitted to the seller, unless the real estate licensee knew the information was false at the time the real estate licensee transmitted or published the information or the licensee acted with reckless disregard as to whether such information was true or false.

8

Reedy inspected the house before the Phillipchucks purchased it and observed the cracks in the foundation wall. He took pictures of the cracks in the foundation and could see where water intrusion had been occurring. He knew foundation repair was needed and communicated this to the Phillipchucks. Prior to the Phillipchucks purchasing the house, Reedy emailed Mechlin and described the house as needing a "full rehab." She determined that the house would be a good investment property. Reedy acted as general contractor and oversaw all of the repairs made to the house to fix its problems. As part of the foundation repair, the subcontractor Reedy hired injected the foundation crack with epoxy, put in I-beams on the interior wall, and built up a swale in the yard to divert water from the foundation.

Platinum entered into an Exclusive Right to Sell Contract with the Phillipchucks that became effective on July 17, 2015. Mechlin checked a box on the document and agreed:

> This Contract pertains to Residential Resale Property. SELLER agrees to complete the Seller's Disclosure and Condition of Property Addendum (Residential) to be provided to prospective Buyers and to update the disclosure statement at the request of Broker…

Despite this language, Mechlin filled out the disclosure form for the Phillipchucks. This is not something that realtors typically do for clients. The disclosure clearly stated that non-occupant sellers are not relieved of the obligation to fill out the disclosure form. It also states that licensees, like Mechlin, would rely on the disclosures made by sellers in the form. Mechlin took on the duty of filling out the disclosure form as opposed to relying on disclosures made by the Phillipchucks. She chose to make slash marks through twelve sections of the disclosure instead of checking the "yes" or "no" boxes for each question in each section. She slashed through the following questions:

Are you aware of:

9

(a) any movement, shifting, deterioration or other problems with walls, foundations, crawl space or slab?
(b) any cracks or flaws in the walls, ceilings, foundations concrete slab, crawl space, basement floor or garage?
(c) any corrective action taken including but not limited to piering or bracing?
(d) any water leakage or damage to the house, crawl space or basement?

The disclosure form stated: "Disclose any material information and describe any significant repairs, improvements, or alterations to the property not fully revealed in both. If applicable, state who did the work, attach to this disclosure any repair estimates, reports, invoices notices, or other documents describing referring to the matters revealed herein." Mechlin wrote on the disclosure form: "The sellers of this property are out of the country and have never visited the property. Their knowledge is limited to the information provided by the contractor and the home inspection. See the attached scope of work." The attached scope of work document was one page and stated the following:

MISC EXTERIOR BRICK, SIDEWALK REPAIR
REPLACE HANDRAILS
LANDSCAPE MULCH POWERWASH
CLEANOUT
INTERIOR PAINT AND REPAIR-REMOVE PANELING SHEETROCK
FIREPLACE
COUNTERTOPS, SINK DISPOSAL
APPLIANCES
LIGHTS FANS DOORS ETC …
CARPET
SERVICE HVAC
UPDATE BATHROOMS
DECK
CLEAN
GARAGE FLOOR
REPAIR FOUNDATION – 1 SHORT WALL NEDS [sic] 4 PIERS
FINISH BASEMENT
MISC

Mechlin testified at trial:

Q. But when you filled out the form on behalf of the Phillipchucks, you didn't X the box that says yes when asked about movement, shifting, or deterioration of the wall's foundation, et cetera, did you?

A. No.

Q. It's safe to say that you knew about it and it's safe to say that the Phillipchucks also knew that that was a problem with that basement at one point?

A. Yes.

Q. If you look at paragraph B, any cracks or flaws in the walls, ceilings, foundations, et cetera. Same thing?

A. Yes.

Q. Paragraph C, any corrective action taken, including but not limited to piering or bracing you certainly knew about that because that's specifically stated on that form; is that right ma'am?

A. Yes.

Q. And again, when you filled this out on behalf of your clients, the Phillipchucks, you didn't X the box that said yes, did you?

A. No.

Q. You didn't provide potential buyers such as Ms. Soetaert that information for them to consider when making this purchase?

A. Yes, I did provide that information by including it in the scope of work.

Q. Okay.

A. It was not omitted, it just wasn't filled out on those particular boxes.

Q. Did you provide any other documents beyond this one page for the benefit of a potential purchaser of this home such as Ms. Soetaert?

A. No.

Q. And you would agree with me, wouldn't you, ma'am, that some of the descriptions on this document are not very specific in what kind of work MoreKC1 was performing; is that true?

11

A. Yes.

Q. And you knew MoreKC1 did not perform the work; correct? Let me be clear. You knew MoreKC1 was subcontracting this work to other contractors; correct?

…

Q. Right. And that's my point. You were aware from having a longtime working relationship with Mr. Reedy that he does not perform the work himself. He subcontracts it out; would you agree with that?

A. Yes.

Q. So would you agree with me that if Mr. Reedy's out there subcontracting this work out that he would have documents that would better describe what was going on than this one-page document attached to Exhibit No. 2?

A. He would have had some invoices.

Q. And those invoices, those documents were never attached to Exhibit 2, to the disclosures, were they, ma'am?

…

A. No.

Mechlin went on to testify about the actions she took to fill out the disclosure form. She looked up the phone number for the electric company, she determined whether the house had an attic fan, she counted the number of ceiling fans in the house, she located a wood burning stove, and she determined whether the property had a sprinkler system. She testified:

Q. You did all of this on behalf of the Phillipchucks because they weren't at the house and you were; is that correct?

A. That's correct.

Q. And you filled all this information out and provided it to potential purchasers; is that right?

A. Yes.

Q. But when I asked about the foundation, you didn't want to provide that information?

A. I did provide the information that it had been repaired.

Q. You did not fill out the disclosure form and provide that information, did you, ma'am?

A. No. I attached it to the disclosure form.

Q. Is it typical for a Realtor to fill out disclosure forms for the seller?

A. No.

Mechlin testified that the document she attached to the disclosure form did not discuss water intrusion, the I-beam protruding through the foundation wall, or that that epoxy injections were necessary. She further stated

Q. Would you agree with me that this was a very incomplete description of the basement that my client had to go on, this document in and of itself?

A. It was the information that was provided to me.

Q. It was provided to you and you filled out the disclosure form and sent it on to potential buyers; correct?

A. Correct.

Mechlin stated at trial that she did not recall going over the disclosure form in detail with the Phillipchucks. She testified:

Q. Okay. In fact, what you did in this case was you slashed out all the sections, you sent it to them through a DocuLoop system, you asked them to click on each page and sign, and you asked them to return it to you.

A. That is not correct.

Q. You had a more extensive conversation with them about that?

A. Whenever I send any document over via – that particular system is Dotloop. I send the documents over with the request that the buyer or seller review the

13

documents carefully and after their review let me know if there needs to be any revisions, additions, exclusions, anything done to them. If not, initial and sign.

Q. Ma'am, this case has been on file for two years and we've gone through hundreds and hundreds and hundreds of documents. I've never seen that document. That e-mail you're referring to, or that -- that letter to the Phillipchucks, I've never seen that document. Does that document exist?

A. It's via Doc -- Dotloop.

Q. I've never seen that document you're telling me there's a correspondence today at trial that you've not provided to the other side over two years that says that you asked them to go through this in detail, provide this information, and we're just now hearing about that today for the first time ever?

A. Yes.

Q. Do you have that document with you here today, ma'am?

A. No, sir, I don't.

Q. You said earlier, if you were a buyer's agent, you would request additional information if you saw something that referred to foundation repair; is that what you said?

A. Yes.

Q. Then as a seller's agent, why don't you just provide that?

A. I didn't have it to provide.

Q. Why didn't you get it from Mr. Reedy and provide it? Why would you -- why would you require the buyer's agent to ask for that information? Why don't you just be forthcoming and provide it from the beginning?

A. It wasn't my job to do that.

Soetaert argued to the jury that Mechlin took on the duty of filling out the disclosure form and did so with an ambivalence that constituted reckless indifference. Though the buyers lived in another country, they would have had a good deal of information about the house's problems and

14

repairs that were made. They would have been able to fill out the disclosure form with some specificity.

Soetaert further argued to the jury that Mechlin was not a disinterested real estate agent without knowledge of the house's problems:

> And this idea that Nancy Mechlin showed up out of nowhere in this project is complete fiction. She was married to Mr. Reedy for 12 years. They owned a business together. They worked together. She listed his property. He went to her -- do you remember this? He went to her the day he found this house, sent an e-mail to her saying, what do you think I can get out of this house? What do you think it's worth? She was in on this thing from the beginning. From day one she was involved in this case. The idea that she showed up one day to a beautiful house, took pictures, and put it on MLS, it's nonsense. It's nonsense. She worked with him. She worked with him for 5 years, 12 years, 17 years, whatever it's been, I don't know. She worked with this man for a long time and she had worked … for these Canadian investors for a long time.

In the light most favorable to the jury's verdict, there was sufficient evidence that Mechlin filled out the disclosure form with a reckless disregard as to whether the statements were true or false. She testified that she knew about issues with the foundation asked about in the disclosure yet chose to not answer those questions. Instead, she claimed she provided the information in the scope of work. However, the information in the scope of work was extremely limited and did not provide the same depth of knowledge that answering the questions in the disclosure would have provided. The scope of work did not mention water intrusion at all. Mechlin provided no documents with the Seller's Disclosure beyond the cryptic scope of work, despite the fact that the disclosure form requested that invoices, repair estimates, and other documentation be provided for "any significant repairs, improvements, or alterations." By providing no documents beyond the Scope of Work, Mechlin effectively represented to buyers that no such documents existed, despite her knowledge from prior dealings with Reedy and the Phillipchucks that further relevant documents would exist. She also represented that the Phillipchucks had no knowledge of the

15

property's condition, or of the extensive rehabilitation work performed at the Property, beyond the Scope of Work and inspection report; this representation was also false.

Soetaert presented a submissible case for Platinum's liability under the MMPA with the limits placed by sections 339.730 and 339.190. There was sufficient evidence Platinum knew or should have known of the condition of the basement and that Platinum acted in reckless disregard as to whether statements contained in the disclosure were true or false. The point is denied.

**Platinum's Point II**

In its second point on appeal, Platinum claims the trial court erred in rejecting its proposed verdict director on the MMPA. It states that the jury instruction given, Instruction 15, confused and misled the jury. Platinum maintains that Instruction 15 did not correctly instruct the jury that a real estate licensee acting as a seller's agent owes no duty to conduct an independent inspection of the property and did not correctly instruct the jury that Platinum is not liable for information in a seller's disclosure unless Platinum signed the seller's disclosure or acted with reckless disregard to the truth or falsity of the statements therein.

"Whether a jury was instructed properly is a question of law this Court reviews *de novo*." *Hervey v. Missouri Dept. of Corrections*, 379 S.W.3d 156, 159 (Mo. banc 2012). "Review is conducted in the light most favorable to the record and, if the instruction is supported by any theory, its submission is proper." *Id*. "Instructional errors are reversed only if the error resulted in prejudice that materially affects the merits of the action." *Id*. (internal quotation marks omitted). "The party challenging the instruction must show that the offending instruction misdirected, misled, or confused the jury, resulting in prejudice to the party challenging the instruction." *Id*.

"Generally, [w]henever Missouri Approved Instructions contains an instruction applicable to the facts of a case, such instruction shall be given to the exclusion of any other instructions on

16

the same subject." *Id.* (internal quotation marks omitted). "[D]eparture from an applicable MAI constitutes error, its prejudicial effect to be judicially determined." *Id.* "If a particular MAI does not state the substantive law accurately, it should not be given." *Id.*

Platinum complains that Instruction 15 did not accurately reflect the limitations of liability set forth in sections 339.730.3 and 339.190.2. Platinum requested the following instruction be given:

> First, plaintiff purchased real estate, and
>
> Second, such purchase was primarily for personal, family, or household purposes, and
>
> Third, in connection with the sale of the aforementioned real estate, Defendant Platinum Realty of Missouri misrepresented or concealed a material fact about the condition of the real estate which was known or should have been known by defendant Platinum Realty of Missouri, LLC before the sale was closed without an independent investigation by Platinum Realty of Missouri, LLC, and
>
> Fourth, with regard to the seller's disclosure referred to in the evidence, defendant Platinum Realty of Missouri, LLC acted with reckless disregard regarding the truth or falsity of the statements made in the seller's disclosure;
>
> Fifth, as a direct result of such conduct, plaintiff sustained damage.

The court did not give Platinum's proposed instruction. Instruction 15, given to the jury, was modified from MAI 39.01 and stated:

> Your verdict must be for Plaintiff on her claim against Defendant Platinum Realty of Missouri, LLC, if you believe:
>
> First, Plaintiff purchased real estate located at 18706 E. 28th Street South, Independence, Jackson County, Missouri, and
>
> Second, such purchase was primarily for personal, family or household purposes, and
>
> Third, in connection with the sale of the aforementioned real estate, Defendant Platinum Realty of Missouri misrepresented or concealed a material fact

17

about the condition of the real estate which was known or should have been known by defendant Platinum Realty of Missouri, LLC, and

Fourth, as a direct result of such conduct, Plaintiff sustained damages

The instruction given to the jury contained, over Soetaert's objection, the language from section 339.730.3 regarding the obligation to disclose adverse material facts that were known or should have been known. Platinum complains that Instruction 15[5] did not include the language from section 339.730.3 that Platinum had no duty to conduct an independent inspection. It claims that Soetaert argued at trial that Mechlin should have had a structural engineer inspect the property before the basement was finished.

We disagree with Platinum's characterization of the testimony at trial. During cross-examination by Platinum's attorney, Mechlin testified that no party requested to have a structural engineer inspect the property prior to closing. During cross-examination by Novani and MoreKC1, Mechlin testified that she always tells her buyers to get an inspection of a potential property. If she were representing a buyer and had an inspection report that showed cracks in the foundation or foundation repairs, Mechlin stated she would advise her buyer to get a structural engineer's report.

---

[5] Instruction 16 is referenced one time in Platinum's brief in a sentence in Point II stating that Instructions 15 and 16 should have contained a statement that Platinum had no independent duty to investigate. Instruction 16 stated:

> Your verdict must be for Defendant Platinum Realty of Missouri, LLC on plaintiff's claim for violation of the Missouri Merchandising Practices Act unless you believe in connection with the sale of the aforementioned real estate, Defendant Platinum Realty of Missouri, LLC misrepresented of concealed a material fact about the condition of the real estate which was known or should have been known by defendant Platinum Realty of Missouri, LLC, and as a direct result of such conduct, Plaintiff sustained damages.

The same analysis set forth in Point II with respect to Instruction 15 also applies to Instruction 16.

18

On redirect examination by Soetaert's attorney, Mechlin was questioned regarding whether a structural engineer hired by Soetaert could have identified the problem given that the basement was finished and the walls were not visible. Mechlin agreed it was unlikely a seller would allow a potential buyer to cut holes in the drywall. The following occurred:

> Q. Would you agree with me that the better practice would have been to have the inspection take place, either by an engineer or by someone else, before the basement was finished and the walls were put up so that an inspector or an engineer could view what was behind the wall and provide that information to potential sellers?
>
> A. I think that would have been wonderful for all parties.

The only other testimony regarding whether a structural engineer should have been hired came during the testimony of the structural engineer Soetaert hired after purchasing the home and experiencing water intrusion. He testified that a structural engineer review is a good idea whenever a foundation has cracks. The structural engineer further testified that an examination of a property can be done even when the walls are covered with drywall, though it would not be as comprehensive.

In its closing argument, MoreKC1's attorney argued that Soetaert knew there were visible cracks in the foundation and should have hired a structural engineer. Soetaert was represented by her own real estate agent and nothing indicated that agent advised a structural engineer inspection. MoreKC1's attorney also reminded the jury that the structural engineer testified Soetaert could have requested an inspection and it would have been possible and potentially helpful.

The testimony at trial was that Soetaert could have and maybe should have hired a structural engineer prior to completing the purchase of the house. She was represented by an agent who should have recommended a structural engineer inspection. The single question, asked in

19

rebuttal to Mechlin's suggestion that Soetaert was at fault for not seeking the opinion of a structural engineer, does not constitute an argument to the jury that Mechlin had a duty to independently inspect the house.

Platinum also complains that Instruction 15 did not contain language from section 339.190 that Platinum is not liable with respect to the seller's disclosure unless it acted with reckless disregard regarding the truth or falsity of the statements made in the seller's disclosure. It claims this instruction was necessary because Soetaert argued to the jury that Mechlin assumed the obligation of the sellers disclosure when she it filled it out and that Mechlin made misrepresentations on the disclosure.

We disagree. The jury was instructed that it had to find that Platinum misrepresented or concealed a material fact about the condition of the real estate which was known or should have been known by Platinum. Soetaert argued at trial that Mechlin did so when she filled out the disclosure form. "Reckless disregard exists when there is a high degree of awareness of ... probable falseness of the statement or there are serious doubts as to [its] truth." *Wandersee*, 263 S.W.3d at 632 (internal quotation marks omitted). A finding that Platinum misrepresented or concealed a material fact about the condition of the real estate via the disclosure is the same as a finding that Platinum acted with reckless disregard with respect to the statements in the disclosure.[6]

---

[6] In her brief, Soetaert argues that the "knew or should have known" language which _was_ included in Instruction 15 imposed a *higher* burden on Soetaert than the "reckless disregard" language which Platinum proposed. Platinum's responsive brief does not dispute this. Notably, in an *amicus* brief supporting Platinum, the Missouri Realtors association argues that the two standards are essentially identical:

> While § 339.190.2 uses the phrase "knew … or acted in reckless disregard," in practice this is just another way of saying "knew or should have known," just as in § 339.730.3. This is because "reckless disregard" is "[t]he intentional commission of a harmful act or failure to do a required act when the actor knows or has reason to know of facts that would lead a reasonable person to realize that the actor's conduct both creates an unreasonable risk of harm to someone and involves a high degree of probability that substantial harm will result." BLACK'S LAW DICT. at 594.

20

Instruction 15 did not misdirect, mislead, or confuse the jury resulting in prejudice to Platinum. The point is denied.

## Platinum's Point III

In its third point on appeal, Platinum claims the trial court erred in denying its motion for a judgment notwithstanding the verdict on the issue of punitive damages against Platinum. It states Soetaert failed to make a submissible case for punitive damages against Platinum[7] by clear and convincing proof of a culpable mental state on the part of Platinum. Platinum maintains there was not evidence of a wanton, willful or outrageous act, or reckless disregard for an act's consequences from which evil motive is inferred. It concludes that the evidence did not show a culpable mental state on the part of Platinum, did not show that Platinum acted wantonly, willfully, outrageously, with reckless disregard for an act's consequences or with an evil motive which could justify an award of punitive damages against Platinum.

"Whether there is sufficient evidence for an award of punitive damages is a question of law." *Howard v. City of Kansas City*, 332 S.W.3d 772, 788 (Mo. banc 2011) (internal quotation marks omitted). "We review the evidence presented to determine whether, as a matter of law, it was sufficient to submit the claim for punitive damages." *Id*. (internal quotation marks omitted). "In doing so, we view the evidence and all reasonable inferences in the light most favorable to submissibility." *Id*. (internal quotation marks omitted).

---

It is questionable whether the jury would have appreciated any distinction between the two standards, even if both had been included in Instruction 15.

[7] The jury awarded punitive damages against Novani and MoreKC1 in the amount of $75,000 each. It awarded punitive damages against Platinum in the amount of $25,000. Only Platinum appeals the award of punitive damages.

21

Section 407.025.1 states that "[t]he court may, in its discretion, award punitive damages." "To make a submissible case for punitive damages, there must be clear and convincing proof of [a defendant's] culpable mental state." *Peel v. Credit Acceptance Corp.*, 408 S.W.3d 191, 209 (Mo. App. W.D. 2013) (internal quotation marks omitted). "Thus, a plaintiff makes a submissible case for punitive damages when he or she presents clear and convincing evidence from which a reasonable jury could conclude that the defendant had an evil motive." *Id*. "A plaintiff establishes a defendant's culpable mental state by showing either that the defendant committed an intentional wanton, willful, and outrageous act without justification *or acted with reckless disregard for the [plaintiff's] rights and interest*." *Id*. at 209-10 (internal quotation marks omitted) (emphasis in original). "Thus, a jury can *infer* the defendant's evil motive when the defendant recklessly disregards the interests and rights of the plaintiff." *Id*. at 210 (emphasis in original).

As discussed at length above, Soetaert successfully argued that Platinum acted with reckless disregard with respect to whether the statements in the disclosure were true or false. Soetaert also argued that Mechlin was involved with the property from the very beginning when the water intrusion issues were known by Novani and MoreKC1. The jury could have inferred Mechlin's evil intent from her actions.

The point is denied.

**Soetaert's Point I**

In her sole point on appeal, Soetaert claims the trial court abused its discretion in determining the amount of attorneys' fees she recovered. She stated that the sum of $10,000 for attorneys' fees and $1,623.47 for costs was so arbitrary, grossly inadequate, and unreasonable as to shock the sense of justice. Soetaert concludes that the trial court failed to consider any of the required factors.

22

"The MMPA is paternalistic legislation designed to protect those that could not otherwise protect themselves." *Ostermeier v. Prime Properties Investments Inc.*, 589 S.W.3d 1, 7 (Mo. App. W.D. 2019) (internal quotation marks omitted). "The legislature granted discretion to the trial court to award, in addition to damages, injunction or other equitable relief and reasonable attorney's fees." *Id*. (citing section 407.025) (internal quotation marks omitted). "These remedial measures are designed not only to remedy violations of the MMPA, but also prospectively to deter prohibited conduct and protect Missouri citizens." *Id*. (internal quotation marks omitted).

"We review the trial court's award of attorney's fees for abuse of discretion." *Terpstra v. State*, 565 S.W.3d 229, 249 (Mo. App. W.D. 2019). "The trial court abuses its discretion when its decision was against the logic of the circumstances and so arbitrary and unreasonable as to shock one's sense of justice." *Id*. (internal quotation marks omitted). "The trial court is considered an expert on fees, given its familiarity with all of the issues in the case and with the character of the legal services rendered, and may determine attorney fees without the aid of evidence." *Id*. (internal quotation marks omitted). "We will not reverse [the award of attorneys' fees] unless we find that the amount was arbitrarily arrived at or is so unreasonable as to indicate indifference and a lack of proper judicial consideration." *Id*. at 249-50 (internal quotation marks omitted).

"The general rule in Missouri is that attorney fees are not awarded to every successful litigant." *Id*. at 250 (internal quotation marks omitted). "However, attorneys' fees may be awarded when they are provided for in a contract or when they are authorized statutorily." *Id*. (internal quotation marks omitted). Section 407.025.1 provides, "[t]he court may, in its discretion, … may award to the prevailing party attorney's fees, based on the amount of time reasonably expended." "While the trial court has discretion to award reasonable attorneys' fees, there are factors that may

23

be considered to determine the amount of attorneys' fees to award." *Terpstra*, 565 S.W.3d at 250 (internal quotation marks omitted).

> Factors considered include: the rates customarily charged by the attorney in the case and other attorneys in the community for similar services; the number of hours reasonably expended on the litigation; the nature and character of services rendered; the degree of skill required; the nature and importance of the subject matter of the litigation; the amount involved or result achieved; and the vigor of the opposition.

*Id.*

"The starting point in determining reasonable attorneys' fees is the lodestar." *Id.* (internal quotation marks omitted). "The lodestar is determined by multiplying the number of hours reasonably expended by a reasonable hourly rate." *Id.* (internal quotation marks omitted). "A reasonable hourly rate is established according to the rates customarily charged by the attorneys involved and by other attorneys in the community for similar services." *Id.* (internal quotation marks omitted).

After the completion of trial, Soetaert sought attorneys' fees in the amount of $128,432.50. Her request claimed fees at the rate of $400.00 per hour for lead counsel; $250.00 per hour for assisting attorneys; and $125.00 per hour for paralegals. Detailed submitted time records showed that Soetaert's lead counsel and associated counsel expended approximately 345 hours from case inception through trial, broken down as follows: 225.3 hours expended by lead counsel; 119.7 hours for assisting attorney time; and an additional 67.9 hours expended by paralegals. In addition, Soetaert sought reimbursement for case expenses in the amount of $5,161.82, which included almost $1,300 in deposition costs, $2,400 in expert witness fees and $1,000 in mediation charges.

The trial court entered its second amended judgment and awarded Soetaert an additional $11,623.47, a figure which purportedly included both attorneys' fees and costs. No breakdown

was provided between attorneys' fees and costs and no explanation was given as to how the court arrived at this figure beyond standard language stating that "good cause was shown."

Soetaert filed an application for reconsideration and request for evidentiary hearing. The trial court made no ruling on Soetaert's request until after the second amended judgment became final, when the trial court issued its order clarifying attorney fee award. That clarifying order stated:

> The Court's Second Amended Judgment, filed March 14, 2019, awarded Plaintiff the sum of $11,623.47 for costs and attorney's fees in this matter. In arriving at this amount, the Court used the lodestar method as the starting point in determining the award of fees. The Court first calculated the number of hours Plaintiff's lead counsel expended during trial. Trial began on Monday, December 10, 2018, and concluded on Wednesday, December 12, 2018, lasting approximately three days. The Court generally operates eight hours a day during trial. Therefore, the Court credited Plaintiff's lead counsel with twenty-four hours expended on litigation during trial. Additionally, the Court recognized the trial had originally been scheduled to last approximately one week and credited Plaintiff's lead counsel for a full forty hour work week, understanding he had likely set aside that amount of time for trial.
> Plaintiff's Motion for Attorney Fees, filed December 20, 2018, indicated that the hourly rates charged by attorneys in this area range from $250 to $600 per hour for lead counsel. The Court multiplied the forty hours credited to Plaintiff's lead counsel by the reasonable rate for attorneys in the area of $250 and arrived at a sum of $10,000.00. Additionally, while Plaintiff submitted a request for cost in the amount of $5,328.43, the Court accepted Defendant Platinum Realty of Missouri, LLC's proposed amount of $1,623.471 as the amount Plaintiff was entitled to, in accordance with case law. By adding costs in the amount of $1,623.47 plus $10,000 for Plaintiff's lead counsel fees, the Court arrived at a total of $11, 623.47.

Although not timely entered, the trial court's order of clarification does provide us with its analysis in rendering its second amended judgment. The trial court credited Soetaert's lead counsel for a total of 40 hours calculated at 8 hours per day for three days in trial and two additional days of eight hours because a full week had likely been set aside for trial. As discussed above, "[t]he lodestar is determined by multiplying the number of hours reasonably expended by a reasonable

25

hourly rate." *Id*. The trial court in this case did not include any time prior to trial beginning in its lodestar calculation. It did not include any time for drafting of the petition, responding to a summary judgment motion, conducting discovery, or any trial preparation either before or during trial. These are hours reasonably expended during the course of a case, and it was an abuse of discretion to not consider them. Further, it ignored the presence and work of the second attorney who worked with lead counsel throughout this process. The case is remanded for the trial court to calculate the lodestar consistent with this opinion.

Platinum argues that Soetaert initially alleged three claims: violation of the MMPA, fraudulent misrepresentation, and civil conspiracy. She dropped the latter two counts right before trial. Much of the work claimed by Soetaert's attorneys related to the two dropped counts. It states that while Soetaert had more than one attorney at trial, only one attorney examined witnesses and argued motions. Moreover, only five witnesses testified at trial: Soetaert, Mechlin, Reedy, the engineer Soetaert hired to help fix the water intrusion, and the woman who owned the house before the Phillipchucks purchased it. These are things the trial court can consider in determining the number of hours reasonably expended during Soetaert's case.

The point is granted.

### Appellate Attorneys' Fees

Before submission of this case on appeal, Soetaert sought an award of appellate attorneys' fees. The motion was taken with the case, and we grant it now. "While appellate courts have the authority to allow and fix the amount of attorney's fees on appeal, we exercise this power with caution, believing in most cases that the trial court is better equipped to hear evidence and argument on this issue and determine the reasonableness of the fee requested." *Veazie-Gallant v. Brown*, 620 S.W.3d 641, 657 (Mo. App. E.D. 2021) (internal quotation marks omitted). Thus, we also remand

for the trial court to calculate the amount of appellate attorneys' fees Soetaert should be awarded consistent with this opinion.

## Conclusion

The judgment is affirmed in part and reversed and remanded in part. Platinum's three points on appeal are denied. Soetaert's point on appeal is granted. The case is remanded and the trial court is ordered to calculate and award attorneys' fees in Soetaert's favor for work done during trial and on appeal consistent with this opinion.

_____
Anthony Rex Gabbert, Judge

All concur.